United States District Court
Southern District of Texas

**ENTERED**

December 20, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH JOHN FLORES, II, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-15-1208 |
| | § | |
| LORIE DAVIS, DIRECTOR, TEXAS | § | |
| DEPARTMENT OF CRIMINAL JUSTICE, | § | |
| CORRECTIONAL INSTITUTIONS | § | |
| DIVISION,[1] | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND RECOMMENDATION GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this proceeding brought pursuant to 28 U.S.C. § 2254 is Respondent's Motion for Summary Judgment (Document No. 13) against Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1).   Having considered Respondent's Motion for Summary Judgment, Petitioner's response in opposition (Document No. 21), the three claims raised by Petitioner in his § 2254 Application (Document No. 1), the state court records, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Respondent's Motion for Summary Judgment (Document No. 13) be GRANTED, that Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1) be DENIED, and that this § 2254 proceeding be DISMISSED WITH PREJUDICE on the merits.

---

[1] Lorie Davis, the new Director of the Texas Department of Criminal Justice, Correctional Institutions Division, is substituted as Respondent. *See* FED. R. CIV. P. 25(d).

## I.    **Introduction and Procedural History**

Joseph John Flores, II ("Flores") is currently incarcerated in the Texas Department of Criminal Justice, Correctional Institutions Division, as a result of four 2010 convictions from the 228th District Court of Harris County, Texas: two for aggravated assault on a public servant, Cause Nos. 1114129 and 1114130; one for possession of cocaine, Cause No. 1222277; and one for possession with intent to distribute hydrocodone, Cause No. 1173815.  Those four convictions all arise out of the same incident and transaction occurring on April 25, 2007, during which a drug raid was conducted on Flores' apartment.  Flores was charged by indictment with those four offenses. He pled guilty to the hydrocodone offense, and not guilty to the other three offenses.  He was found guilty by a jury of all four offenses on August 21, 2008, but his Motion for New Trial, predicated on his claim of ineffective assistance of trial counsel, was granted on October 23, 2008.  Upon retrial, which took place from March 31, 2010 to April 13, 2010, Flores again pled guilty to the hydrocodone offense and was again found guilty by the jury of the other three offenses.  The trial court, upon Flores' election, sentenced him to thirty years incarceration on the aggravated assault offenses, fifteen years incarceration on the cocaine offense, and twenty years incarceration on the hydrocodone offense.   Texas' First Court of Appeals affirmed all four convictions in two separate, unpublished opinions. *Flores v. State*, Nos. 01-10-00531-CR, 01-10-00532-CR, and 01-10-00534-CR, 2013 WL 709100 (Tex. App.–Houston [1st Dist.] Feb. 26, 2013); *Flores v. State*, No. 01-10-00533, 2013 WL 709106 (Tex. App-Houston [1st Dist.] Feb. 26, 2013).  The Texas Court of Criminal Appeals refused further direct review on February 5, 2014, and March 12, 2014.

Flores did not filed a state application for writ of habeas corpus challenging his convictions.  Instead, within one year of his convictions becoming final, he filed, through retained counsel, this

2

§ 2254 proceeding.

## II.     Claims

Flores raises three claims in his § 2254 application:

1.     that the State suppressed evidence that called into question the validity of Flores' prior drug conviction, which prior conviction was used by the State to impeach his testimony at trial;

2.     that his right to present a complete defense was abrogated by the state trial court, which excluded evidence and/or testimony that would have allowed him to impeach Officer Scoggins, one of the complainant officers; and

3.     that he was denied due process when his guilty plea to the hydrocodone offense was accepted without him being admonished on the range of punishment for that offense.

Respondent argues in the Motion for Summary Judgment that no relief is available to Flores on the merits of any of his claims under 28 U.S. § 2254(d) because the Texas Court of Appeals fully addressed, considered and rejected each claim on the merits, and such rejection was not contrary to or based on an unreasonable application of clearly established Federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Flores, as he has insisted from the inception of this § 2254 proceeding, maintains that the state courts' rejection of his claims is based on an unreasonable application of clearly established Federal law and/or an unreasonable determination of the facts in light of the record evidence.

## III.     <u>Standard of Review – Merits Review under § 2254(d)</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim presented in a federal habeas corpus proceeding has already been adjudicated on the merits in a state

proceeding, federal review is limited.  28 U.S.C. § 2254(d) provides:

> (d)  An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

"[A] decision by a state court is 'contrary to' [the United States Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'" *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams*, 529 U.S. at 405-406). A state court decision involves an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "State-court decisions are measured against [the Supreme Court's] precedents as of 'the time the state court renders its decision.'" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)). Similarly, state court decisions are reviewed under § 2254(d) by reference to the

facts that were before the state court at the time. *Id.* at 182-183 ("It would be strange to ask federal courts to analyze whether a state court adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.").

For factual issues, "the AEDPA precludes federal habeas relief unless the state court's decision on the merits was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" 28 U.S.C. § 2254(d)(2) (2000). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, factual determinations made by state courts carry a presumption of correctness and federal courts on habeas review are bound by them unless there is clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1) (2000). *Smith v. Cockrell*, 311 F.3d 661, 667 (5ᵗʰ Cir. 2002), *cert. dism'd,* 541 U.S. 913 (2004).

Under § 2254(d), once a federal constitutional claim has been adjudicated by a state court, a federal court cannot conduct an independent review of that claim in a federal habeas corpus proceeding. *Harrington v. Richter*, 562 U.S. 86, 100-101 (2011). Rather, it is for the federal court only to determine whether the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, and whether the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Woodford*, 537 U.S. at 27 ("The federal habeas scheme leaves primary responsibility with the state courts for these judgments and authorizes federal-court intervention only when a state-court decision is objectively unreasonable."). This is true regardless of whether the state court rejected the claims summarily, or with a reasoned

analysis. *Cullen*, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."). Where a claim has been adjudicated on the merits by the state courts, relief is available under § 2254(d) *only* in those situations "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Richter*, 562 U.S. at 102.

Whether a federal habeas court would have, or could have, reached a conclusion contrary to that reached by the state court on an issue is not determinative under § 2254(d). *Id.* ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable."). In addition, the correctness of the state court's decision is not determinative. As instructed by the Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), "[i]n order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. . . . The state court's application must have been 'objectively unreasonable.'" (citations omitted); *see also Price*, 538 U.S. at 641 ("'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.'") (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)). Moreover, it is the state court's ultimate decision that is to be reviewed for reasonableness, not its reasoning. *Neal v. Puckett*, 286 F.3d 230, 244-46 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003); *Pondexter v. Dretke*, 346 F.3d 142, 148-9 (5th Cir. 2003), *cert. denied*, 541 U.S. 1045 (2004). A habeas petitioner can only overcome § 2254(d)'s bar "by showing that 'there was no reasonable basis'" for the state court's rejection of his claim(s). *Cullen*, 563 U.S. at 188 (quoting *Richter*, 562 U.S. at 98)).

IV.   **Factual Background**

The factual and evidentiary background, summarized by the Texas Court of Appeals in affirming Flores' convictions, is particularly relevant to the claims Flores raises herein, the state courts' rejection of those claims, and this Court's review under § 2254(d). That lengthy, but important, summarization of the evidence is as follows:

> Houston Police Department ("HPD") Officer F. Rodriguez testified that on April 23, 2007, he, as a case agent in HPD's narcotics division, received information from a confidential informant that appellant sold narcotics from his apartment. To confirm the informant's report, Rodriguez, along with a "targeted narcotics enforcement team," began conducting surveillance on appellant's apartment. He first sent the informant to the apartment to make a "buy," and the informant returned with codeine obtained from within the apartment. The police officers continued their surveillance and noticed "sporadic traffic" in and out of appellant's apartment. Based on the information he received, Rodriguez drafted a search warrant for the apartment.

> After a judge signed the warrant, Officer Rodriguez, on April 25, 2007 at 6:00 a.m., convened a team of himself, Officer F. Scoggins, Lieutenant D. Gafford, and four other HPD officers to address his "raid plan" for executing the warrant. The team wore the "standard uniform" for a "hard entry," which consisted of black pants, "some kind of black T-shirt that says police," a "heavy protective ballistic vest" with "police" printed on the front and back, and ballistic Kevlar helmets. Rodriguez's surveillance indicated that appellant would usually sell narcotics until 4:00 a.m ., so he expected appellant to be asleep when the police officers executed the warrant.

> Upon the officers' arrival at the apartment complex, Officer Wood obtained a key to appellant's apartment from the apartment manager. As the officers approached appellant's front door, Officer Rodriguez noted that a light was on in the kitchen. Wood knocked, announced "police," and attempted to open the door with the key, but the door was restrained by a deadbolt lock. Rodriguez, who heard "movement" and "footsteps running" from inside the apartment, motioned for HPD Officer Bradley to knock down the door with a battering ram. After three tries, Bradley breached the door and stepped aside to allow Scoggins, who was designated as the "point man" and carried a shotgun, to enter the apartment first, followed by Rodriguez.

> Upon their entry, all of the officers shouted "police, search warrant, police, get on the ground." Rodriguez then saw appellant move away from the front door with a shotgun "that he was trying to manipulate and trying to work." Officer Scoggins shouted at appellant to "drop the gun," which was pointed at Scoggins and Rodriguez, but appellant "ejected a round from the chamber and tried to load another

one to try to make it fire." Scoggins then shot appellant, who retreated behind a wall for "a second" before he "stepped back out" and attempted to "jack another round into the chamber." Rodriguez then shot him. Appellant dropped the shotgun and fell to the ground. Rodriguez noticed a woman, later identified as Jessica Davies, on a couch beside the other officers, and he ordered Davies to show her hands. She "totally complied and just laid there and didn't move." He then called for emergency assistance for appellant, and, because the officers had shot a civilian, he called HPD's Internal Affairs Office to the scene.

After paramedics transported appellant to a hospital, the officers proceeded to search the apartment. They discovered several "little bags" of marijuana throughout the apartment, "pure" codeine, and several bags of cocaine that Officer Rodriguez opined to have come "off of a brick of cocaine or a kilo of cocaine." The officers also found a pistol, several baby bottles, which Rodriguez opined were used for distributing codeine, a ledger tracking various narcotics sales, and a safe containing "a whole list of different drugs," over 1,000 pre-packaged hydrocodone pills, 593 pre-packaged Xanax pills, and "hydroponic" marijuana. Rodriguez explained that the amount and packaging of the narcotics were consistent with an intent to deliver. And he noted that although he and Officer Scoggins were called before a grand jury regarding appellant's shooting, they were "cleared of wrongdoing."

On cross-examination, Officer Rodriguez conceded that in the stance that officers are trained to use when aiming their firearms at a target, the word "police" on the front of their ballistics vests is blocked by their arm. He also conceded that a burglar could impersonate a police officer in an attempt into gain entry to a residence. Rodriguez noted that after shooting appellant, he removed two unfired cartridges from appellant's shotgun. And Rodriguez explained that the officers found forty-two grams of cocaine underneath the mattress of appellant's bed and thirteen grams of cocaine behind the headboard.

Officer Scoggins testified that the officers wore raid gear instead of police uniforms because the warrant was considered "high-risk" and the officers needed greater protection. The raid gear was distinctively marked with the word "police" on the front and back. He explained that after very loudly announcing, "police, search warrant, get on the ground," he entered the apartment and, after one or two steps, saw appellant moving away from the front door and pointing a shotgun at him. Scoggins "fully expected to get shot" because appellant was fumbling with his firearm and "looked like he was trying to discharge it." Accordingly, Scoggins fired his shotgun "as fast as [he] could take the safety off and shoot it ." Appellant then hid behind a wall, but quickly emerged and pointed his shotgun toward Officer Rodriguez. Scoggins then pulled the trigger on his shotgun a second time, but it misfired. As Scoggins attempted to fix the malfunction, Rodriguez shot appellant, who fell to the ground and dropped his shotgun. On cross-examination, Scoggins admitted that before HPD Internal Affairs officers arrived to investigate the shooting, he and the

other officers informally discussed the incident. He further admitted that other officers were present when he was first questioned by the Internal Affairs investigators.

James Miller, a chemist in HPD Crime Lab's "controlled substances section," testified that he received and tested the narcotics seized from the search of appellant's apartment. The combined weight of the cocaine found in appellant's apartment was 44.3 grams. Miller explained that the weights of the narcotics, when tested in the crime lab, often differ from the weights obtained by police officers at crime scenes because the officers occasionally include the packaging when weighing narcotics. He also noted that the crime lab is more particular about the accuracy of its scales. On cross-examination, Miller explained that he received two different samples of cocaine, the larger of which weighed 41.1 grams and the smaller of which weighed 3.2 grams.

Jennifer Davies first testified outside of the presence of the jury for the trial court to determine the voluntariness of a written statement that she had given to officers after the shooting. She explained that after the officers had shot appellant, they placed her in handcuffs and escorted her to the back of a patrol car, where she remained for "[a]bout six and a half hours." At some point, an officer asked her whether she had "heard anything" before the officers entered the apartment. Before she could respond, the officer told her, "You need to think about what you're saying because you can go down just like that guy." Another officer then transported her to a police station, asked her questions, and "provid[ed her] the answer" to those questions, which were not "consistent with what [she] saw and ... heard." Davies believed that the officers were threatening to charge her with possession of the narcotics found in appellant's apartment if she did not answer their questions the way that they suggested. The trial court denied appellant's motion to suppress Davies' statement, finding that it was made voluntarily and was not a product of coercion.

Davies then testified in the presence of the jury that, as of April 25, 2007, she had been dating appellant for "[m]aybe four months." And she continued to date appellant through the time of the trial. Davies explained that she had arrived at appellant's house at around 4:00 a.m., before the execution of the search warrant, to watch television and "just hang out." Appellant had told her that he "possesse[d] some drugs," such as codeine and marijuana, but she did not know where any narcotics were stored and did not know of any cocaine in the apartment. Davies fell asleep on the couch while the television was still on, and, when she awoke, she saw "two or three people in a dark uniform" and heard "a lot of hollering." She then turned and saw appellant laying down and not moving. Davies did not hear anyone yell "police," and she did not see appellant attempt to shoot at Officers Rodriguez and Scoggins. A police officer then handcuffed Davies and escorted her to a patrol car in the apartment complex parking lot, where she sat for approximately six hours. Eventually, the officers escorted another woman, later identified as Jeannette Russell, to the patrol car to wait with Davies.

After Davies admitted that she had previously been convicted of making a false statement to a peace officer, she was shown State's Exhibit number 156, the written statement she had given to a police officer at a police station. In her sworn statement, Davies had said that she had "heard a pound at the door and a loud male voice say police." However, she testified that she felt "threatened" into signing the statement and she did not actually hear a pound on the door or a voice saying, "police." Davies also admitted that much of the information given in her statement, such as the nature of her relationship with appellant, was true. The trial court then admitted the written statement into evidence with the limiting instruction that it be considered only for the purpose of "passing upon the credibility of this witness."

Jeanette Russell testified that on the morning of April 25, 2007, she was sitting on the patio at her apartment, located in the same complex as appellant's apartment. She was "starting to doze off" when she was awakened by loud noises. Russell then saw several police officers approach appellant's apartment, and they were "wearing uniforms and vests that had Houston police on them in gold ." As the officers reached the door to appellant's apartment, Russell heard them loudly "holler[ ] police" followed by three "bangs." Some time later, she saw an officer escort Davies out of appellant's apartment.

Later that day, an HPD detective came to Russell's apartment, informed her that the officers had seen her on her patio, and asked her to come to a police station to give a statement regarding what she had seen. The detective escorted her to a patrol car, where Davies was sitting in the back seat, and he told them that they could not talk to each other about the shooting. He then drove Russell and Davies to a police station, where Russell gave a statement to an officer, who "heard [her] statement and typed till it was finished." After giving her statement, Russell waited in the police station with Davies, who told her that her boyfriend had just been shot by a police officer. Davies told her that she knew they were police officers when they entered the apartment. She stated that appellant had "made bad choices" and had tried to shoot the officers. However, Davies never mentioned being coerced or intimidated into giving a false statement. On cross-examination, Russell explained she had a "clear view" of the front and back of the police officers' vests as they approached appellant's apartment.

HPD Detective J. Selvera testified that he was assigned after the shooting to "canvass the area" around appellant's apartment for potential witnesses. After speaking with several of appellant's neighbors, Selvera interviewed appellant at a hospital. After Selvera began to read to appellant his legal rights, but before he could finish, he had to "terminate the interview." However, after Selvera had tried "several times" to end the interview, appellant "continue[d] to re-initiate" the conversation. Selvera then recorded appellant's statements, which were admitted into evidence.

Karen Fanaff, who had lived in the same apartment complex as appellant, testified that on the morning of April 25, 2007, she heard a "loud bang" followed by a second sound she immediately recognized as a gunshot. Startled, she stepped onto her balcony and saw "six or seven gentlemen who appeared ... to be police officers." Some of the officers were wearing "standard uniforms," while others were dressed like a "SWAT team" but still appeared to be "official" police officers. Although Fanaff did not hear any voices or anyone yelling "police" from inside her apartment, she was not surprised because of the noise in her own apartment. After Fanaff testified, several other neighbors testified that they had not heard anyone yell "police."

Appellant testified that on April 25, 2007, he knowingly possessed, with the intent to sell, hydrocodone, Xanax, and marijuana. However, he explained that he was not aware that cocaine had been hidden in his bedroom. And he later learned that the cocaine belonged to his friends, Danny Garcia and Aaron Trevino. Appellant explained that Garcia and Trevino had previously asked if they could leave cocaine in his apartment, but they did not ask for permission on that day. Appellant also noted that several burglaries had been committed in his apartment complex, and he had seen a news report about "people pretending to be police officers when they broke into residences." And a few weeks before trial, he had visited a "police supply store" where he was allowed to purchase shirts and hats that had "police" written on them.

In the morning on April 25, 2007, appellant had smoked marijuana and had taken codeine before Davies had come to his apartment. They fell asleep shortly after her arrival and had left the television and the kitchen light on. Appellant was then awakened by a loud noise "like a hurricane" hitting his front door. Because he believed that "burglars" or "robbers" were trying to get inside his apartment, appellant grabbed his firearm when a man in black clothes entered the apartment carrying a firearm. Appellant then "cocked the shotgun" and "cycled the action," with the safety still engaged, in an attempt to frighten the intruder. Appellant was then shot, took cover behind a wall, and then emerged from behind the wall to "cycle the action at them again to try to scare them away." However, he was "instantaneously" shot again. During the entire incident, appellant did not hear anyone yell "police" or see badges, patches, or a distinctive police uniform. Only after he was shot, did appellant realize that the men who had entered his apartment were police officers.

On cross-examination, appellant admitted that he had previously "disregarded the lawful commands of a police officer knowing they were a police officer" and been convicted of the felony offense of possession of a controlled substance and the misdemeanor offenses of theft and burglary of a motor vehicle. He explained that Garcia and Trevino had come to his apartment the night before the shooting and suggested that they must have left the cocaine in his room that night. Later, when Detective Selvera attempted to interview him at the hospital, appellant told him, "I need to talk to my lawyer because I know I didn't try to kill no one." However, after invoking his right to counsel, appellant told Selvera that he "thought [he] was getting

robbed" and he "was cocking [his gun] just to try to scare them."

*Flores v. State*, Nos. 01-10-00531-CR, 01-10-00532-CR, 01-10-00534-CR, 2013 WL 709100 *1-*6

(Tex. App.–Houston [1st Dist.] Feb. 26, 2013).


## V.    Discussion – § 2254(d) Review

Each of Flores' claims was presented to, and rejected by, the Texas Court of Appeals in

connection with Flores' direct appeal.  Given that adjudication of his claims by the state courts, relief

is available herein only if the state court's adjudication of the claims was legally or factually

unreasonable.  That standard, as expressed by the United States Supreme Court, is "difficult to

meet." *Metrish v. Lancaster*, ___ U.S. ___, 133 S.Ct. 1781, 1786 (2013).

When legal unreasonableness is claimed as a basis for relief under § 2254(d)(1), it is the

petitioner's burden to "show that the state court's ruling on the claim being presented in federal court

was so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S.Ct. 1697, 1702

(2014).  In other words,"relief is available under § 2254(d)(1)'s unreasonable-application clause if,

and only if, it is so obvious that a clearly established rule applies to a given set of facts that there

could be no 'fairminded disagreement' on the question."  *Id.* at 1707.   When factual

unreasonableness is claimed as a basis for relief under § 2254(d)(2), it is not enough for a petitioner

to show that a federal court would have reached a different factual determination "in the first

instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Instead, because of the substantial deference

that is to be afforded state court factual findings, relief is available under § 2254(d)(2)'s

unreasonable determination clause if reasonable jurists would uniformly disagree with the factual

finding in question. *Brumfield v. Cain*, ___ U.S. ___, 135 S. Ct. 2269, 2277) ("If "[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.'") (quoting *Wood*, 558 U.S. at 301))

### A.    *Brady* claim

In his first claim, Flores maintains that the State suppressed evidence that would have shown the invalidity of a 2001 drug conviction – a prior drug conviction which was used by the State for impeachment purposes.  According to Flores, the State knew that his prior conviction for possession of MDMA (ecstasy), was not supported by the lab testing evidence, which showed that the quantity of MDMA was between 2.6 and 3.7 grams – a quantity would have only supported a third degree felony offense, not the second degree felony offense he was charged with, pled guilty to, and was questioned about at his trial.  Flores argues, as he did in his post trial motions and his direct appeal, that the State's suppression of evidence about the invalidity of the prior MDMA conviction constituted a due process violation, as articulated by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963).  Flores further argues that the state courts' rejection of his *Brady* claim is based on an incorrect and unreasonable application of *Brady* and its materiality requirement.

Suppression of evidence claims are governed by the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963)*, in which Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

13

*Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).  Evidence is "material" for purposes of a suppression of evidence claim if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 683 (1985).  The reasonable probability inquiry is

> not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.  Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'

*Strickler*, 527 U.S. at 290 (quoting *Kyles v. Whitney*, 514 U.S. 419, 434 (1995).

On direct appeal, the Texas Court of Appeals addressed Flores' two separate, but related claims: that the State suppressed evidence as to the quantity of MDMA he possessed in connection with his prior conviction for possession of MDMA; and that the trial court "erred in admitting into evidence his prior felony conviction for possession of MDMA."  In rejecting the *Brady* suppression of evidence claim, the Texas Court of Appeals concluded that the "suppressed" evidence did not prove that Flores "was actually innocent of possessing more than four grams of MDMA," and that it could not be concluded "that the evidence would have rendered [Flores'] prior felony conviction inadmissible on the grounds that it was invalid, void or inadmissible for impeachment." at *11.  In so doing, the Texas Court of Appeals wrote:

> In his second and third issues, appellant argues that the trial court erred in "denying a mistrial after the State disclosed" that it had "suppressed evidence that would have rendered appellant's prior felony conviction inadmissible" because his testimony should not have been impeached with evidence of the conviction. In his fourth issue, appellant argues that the trial court erred in "denying [his] motion to suppress his prior felony conviction because it is invalid."
>
> The State has an affirmative duty to disclose evidence favorable and material to a defendant's guilt or punishment under the due process clause of the Fourteenth Amendment. *See Brady v. Maryland,* 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97

14

(1963). A defendant is entitled to a new trial if (1) the State suppresses evidence, (2) the evidence is favorable to the accused, and (3) the evidence creates a probability sufficient to undermine the confidence in the outcome of the proceeding, i.e., the evidence is material. *Harm v. State,* 183 S.W.3d 403, 406 (Tex.Crim.App.2006). In regard to the second prong, "[f]avorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence." *Id.* at 408. "Exculpatory evidence may justify, excuse, or clear the defendant from fault, while impeachment evidence is that which disputes or contradicts other evidence." *Id.* "Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the State's failure to disclose the favorable evidence ." *Id.* at 406.

At trial, the State introduced into evidence appellant's 2001 conviction, entered after a guilty plea, for felony possession of more than four grams and less than 400 grams of "MDMA," also known as "ecstasy." Appellant moved to suppress evidence of the conviction, arguing that it was invalid because "the offense report from that case reflects that the quantity of the substance was weighed by the police without packaging as 2.6 grams," rendering him actually innocent of the second-degree felony offense of possession of more than four, but less than 400 grams of MDMA. Appellant also argued that his guilty plea was involuntary because "if [his] counsel had advised him that the offense report reflected that the weight of the substance was 2.6 grams, [he] would not have pled guilty." The trial court denied his motion to suppress. Appellant's conviction of the felony offense of possession of MDMA was also alleged in an enhancement paragraph in the instant cases. However, before the punishment phase of trial, the State noted that it did some research to try to determine the actual weight of the narcotics because, in the offense report, "the drugs allegedly weighed 2.6 grams." The State obtained a copy of the official lab report, which did not list a weight for the narcotics. Also, Derek Sanders, a chemist at the Pasadena Police Department crime lab, informed the State that "the weight of 3.7 grams of Ecstasy was found in a worksheet that belonged to the chemist who's no longer employed there." He explained that he could not "swear under oath that that is the accurate weight" and did not know "why that weight did not make it into the official document." The State ultimately abandoned the enhancement paragraph but submitted the lab report into evidence "if [appellant] want[s] relief further down the road." Appellant then moved for a mistrial, arguing that, pursuant to *Brady,* the State was required to produce any "information to support [his] assertion that if [he] possessed Ecstasy, it was less than four grams," but it failed to produce anything until the punishment phase of trial.

The trial court conducted an evidentiary hearing on appellant's motion for mistrial in which the prosecutor, Maritza Antu, testified that she did not recognize the discrepancy until appellant filed a motion to quash the enhancement paragraph before trial. She noted that the offense report included a weight of MDMA at 5.1 grams. However, Antu stated that she did not call the crime lab to clarify the weight because

appellant had pleaded guilty to having possessed more than four grams of MDMA and she "couldn't go based on what an offense report said versus" the judgment and mandate. She explained that because the trial court had asked whether she had possession of the lab report, she then felt compelled to call the crime lab to procure one. At that time, Sanders sent her the official lab report that did not list a weight of the MDMA. Antu also noted that when Sanders told her the weight recorded on the worksheet, he explained that the weight was not official and "he could not testify under oath that that's what the weight actually was." The trial court denied appellant's motion for a mistrial.

Appellant asserts that the State "suppressed evidence from the crime lab that would have shown that [his] prior felony conviction was invalid because he was actually innocent of possessing more than four grams of MDMA." The evidence introduced in the mistrial hearing consisted of the lab report, which does not note the weight of the MDMA, and the lab "worksheet," which indicates that that the MDMA weighed about 3.7 grams. However, Sanders testified that the worksheet indicated that the MDMA was tested on April 3 and 4 of 2001, and appellant pleaded guilty to the offense approximately two weeks earlier, on March 19, 2001. Sanders also explained that, without personal knowledge, he could not alter the lab report to reflect a weight of 3.7 grams. He noted that the only way he could testify to the actual weight of the MDMA was to retest it himself. And, even assuming that appellant's assertion that the lab worksheet accurately indicates the weight of the MDMA as 3.7 grams, we note that possession of MDMA weighing more than one gram but less than four grams is still a third-degree felony offense, as opposed to a second-degree felony offense. *See* Tex. Health & Safety Code Ann. § 481.103(a)(1) (Vernon Supp.2012); *id.* § 481.116(c) (Vernon 2010). Thus, even assuming some uncertainty regarding appellant's conviction for possession of MDMA, we cannot conclude that the evidence presented at the mistrial hearing demonstrates a probability sufficient to undermine the confidence in the outcome of the proceeding. *See Harm,* 183 S.W.3d at 406 (noting requirement that defendant must be prejudiced by State's failure to disclose evidence).

Furthermore, we note that the evidence adduced at the hearing would not render appellant's conviction for possession of MDMA "invalid" or "void." A prior conviction which is void cannot be used for the purpose of enhancing punishment or impeachment. *Wood v. State,* 478 S.W.2d 513, 515 (Tex.Crim.App.1972). However, a judgment is void only in very rare situations, usually due to the trial court's lack of jurisdiction. *Nix v. State,* 65 S.W.3d 664, 668 (Tex.Crim.App.2001). The very nearly exclusive list of situations in which the judgment of conviction is void are those in which: (1) the document purporting to be a charging instrument does not satisfy the constitutional requisites of a charging instrument, and, thus, the trial court has no jurisdiction over the defendant; (2) the trial court lacks subject-matter jurisdiction over the offense charged, such as when a misdemeanor involving official misconduct is tried in a county court at law; (3) the record reflects that there is no evidence to

16

support the conviction; or (4) an indigent defendant is required to face criminal trial proceedings without appointed counsel, when such has not been waived. *Id.* Moreover, for a judgment to be void, the record must leave no question about the existence of the fundamental defect. *Id.* "If the record is incomplete, and the missing portion could conceivably show that the defect does not in fact exist, then the judgment is not void, even though the available portions of the record tend to support the existence of the defect." *Id.* at 668–69.

From this record, we cannot conclude that there is no evidence to support the conviction or agree with appellant that the evidence proved that he was actually innocent of possessing more than four grams of MDMA. Thus, even assuming that the State suppressed any evidence in this case, we cannot conclude that the evidence would have rendered appellant's prior felony conviction inadmissible on the grounds that it was invalid, void, or inadmissible for impeachment. Accordingly, we hold that any alleged suppression of evidence regarding appellant's prior conviction for possession of MDMA was immaterial and the trial court did not abuse its discretion in denying appellant's motion for mistrial or motion to suppress the prior conviction.

*Flores*, 2013 WL 709100 at \*9-\*11. Then, in addressing Flores' claim that the trial court erred in admitting evidence of his prior MDMA conviction because it was more prejudicial than probative, the Texas Court of Appeals found that the admission of the prior MDMA conviction *was* erroneous under TEX. R. EVID. 609(a), but that the "non-constitutional error" was harmless:

In his fifth issue, appellant argues that the trial court erred in admitting into evidence his prior felony conviction for possession of MDMA because it had "little impeachment value" and was "too prejudicial for admission."

Evidence of a witness's prior conviction shall be admitted for purposes of impeachment if the crime was a felony or a crime of moral turpitude and the court determines that the probative value of the evidence outweighs its prejudicial effect. Tex.R. Evid. 609(a). In *Theus v. State,* the Texas Court of Criminal Appeals set out a non-exclusive list of factors courts should use to weigh the probative value of a conviction against its prejudicial effect. 845 S.W.2d 874, 880 (Tex.Crim.App.1992). The factors include (1) the impeachment value of the prior crime, (2) the temporal proximity of the prior crime relative to the charged offense and the witness's subsequent history, (3) the similarity between the prior crime and the charged offense, (4) the importance of the witness's testimony, and (5) the importance of the witness's credibility. *Id.* The proponent seeking to introduce evidence pursuant to rule 609 has the burden of demonstrating that the probative value of a conviction outweighs its prejudicial effect. *Id.*

In regard to the impeachment value of prior offenses, we note that narcotics-related crimes tend to have a lower impeachment value because they do not involve deception, moral turpitude, or violence. *See Denman v. State,* 193 S.W.3d 129, 136 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd) (rejecting State's argument to hold delivery of cocaine to be crime of moral turpitude). Thus, appellant's prior conviction for possession of MDMA does not have high impeachment value, and the first *Theus* factor weighs against admissibility.

In regard to the temporal proximity of prior offenses relative to a charged offense, the law favors admission of prior offenses if they occurred recently and the witness has demonstrated a pattern of running afoul of the law. *See Theus,* 845 S.W.2d at 881. Here, appellant was convicted of the felony offense of possession of MDMA and the misdemeanor offenses of theft in 2001 and burglary of a motor vehicle in 2003. Appellant's prior felony conviction for possession of MDMA occurred nine years before trial, and although his misdemeanor convictions did indicate a propensity for "running afoul of the law," the last of those convictions occurred seven years before trial. Even if his criminal history indicated some pattern of breaking the law, his crimes were committed far enough in the past to mitigate their probative value. *See Woodall v. State,* 77 S.W.3d 388, 395–96 (Tex.App.-Fort Worth 2002, pet. ref'd) (stating, although convictions showed propensity for criminal behavior, convictions also had to be recent for third factor to weigh in favor of admissibility). Thus, the second *Theus* factor weighs slightly against admissibility.

In regard to the similarity between the prior offense and the instant offense, we note that the elements of the offense of possession of MDMA are substantially similar the elements of the offense of possession of cocaine. The similarity between his prior felony offense and the offense of possession of cocaine militates against admissibility. *See Miller v. State,* 196 S.W.3d 256, 268 (Tex.App.-Fort Worth 2006, pet. ref'd) (holding similarity between two offenses of possession of controlled substance militated against admission of prior conviction); *Fautner v. State,* No. 05–01–01297–CR, 2003 WL 21783349, at *3 (Tex.App.-Dallas Aug. 4, 2003, no pet.) (not designated for publication) (stating that prior convictions for possession of cocaine were similar to charged offense of possession delivery of cocaine). And the admission of his conviction for possession of MDMA was likely prejudicial to his defense in regard to the offense of possession of cocaine. *See Rodriguez v. State,* 129 S.W.3d 551, 560 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd).

In regard to the substance of appellant's testimony and the importance of his credibility, appellant testified at trial that he was unaware that the men who entered his apartment were actually police officers, he believed them to be burglars, he did not intend to shoot them but only to frighten them, he never heard the officers announce their presence as police officers, and he did not possess the cocaine found in his bedroom. He was the only witness who could testify as to his knowledge of the presence of cocaine in his apartment and his belief that the police officers were

18

burglars. Thus, his credibility was critical. Therefore, we conclude that the fourth and fifth *Theus* factors favor admission. *See Davis v. State,* 259 S.W.3d 778, 784 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd). However, because the first three *Theus* factors weigh against admission, we hold that the trial court erred in admitting into evidence his prior felony conviction.

A violation of evidentiary rules that results in the erroneous admission of evidence constitutes non-constitutional error. *See* Tex.R.App. P. 44.2(b). Non-constitutional error "that does not affect substantial rights must be disregarded." *Id. A* substantial right is affected when an error has a substantial and injurious effect or influence in determining a jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Therefore, a criminal conviction should not be overturned for non-constitutional error if an appellate court, upon examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Cobb v. State,* 85 S.W.3d 258, 272 (Tex.Crim.App.2002). In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Motilla v. State,* 78 S.W.3d 352, 355 (Tex.Crim.App.2002). In his testimony, appellant admitted to knowingly possessing, at the time the officers executed the search warrant, "a lot" of hydrocodone, Xanax, and codeine with the intent to deliver the narcotics. He also admitted to knowingly possessing steroids for personal use and MDMA with the intent to deliver it. Appellant's ledger, which tracked various narcotics transactions was admitted into evidence, and he further admitted to being a narcotics user and dealer since he was 17 or 18 years old. Thus, the prejudicial effect arising from the admission of appellant's prior conviction of felony possession of MDMA was mitigated by his own testimony. We cannot conclude that the admission of his prior conviction had a substantial or injurious effect or influence in determining the jury's verdict. Accordingly, we hold that the trial court's error in the admission of appellant's prior conviction for possession of MDMA was harmless.

*Id.* at *11–13.

Taking together the Texas Court of Appeals' consideration of Flores' two claims related to the use of his prior conviction for impeachment purposes, it cannot be said that the Texas Court of Appeals' rejection of Flores' *Brady* claim on materiality grounds was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White,* 134 S.Ct. at 1702. As pointed out by the Texas Court of Appeals,

the evidence in the record as to the quantity of MDMA Flores possessed in 2001 was far from clear. As such, the lab evidence Flores points to as being suppressed would not have invalidated, or rendered void, Flores' prior conviction for possession of MDMA.[2]  Moreover, the impeachment value of the prior MDMA conviction was found to be low, particularly given Flores' own testimony about his drug use and drug sales over the course of many years.  While Flores maintains that the impeachment value of the prior MDMA conviction was high and that "[t]here is a reasonable probability that the jury would have believed petitioner's testimony had it not learned that he was a convicted felon," Petitioner's response to Respondent's Motion for Summary Judgment (Document No.21) at 4, Flores ignores the considerable weight of the evidence against him on all the offenses. Flores also ignores the fact that the prior MDMA conviction was of the same nature as the illegal drug activity he admitted to participating in and, therefore, evidence of the prior conviction, whether that conviction was technically valid or not, cannot be said to have "put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290.  Upon this record, because the "reasonable probability" determination made by the Texas courts was not objectively unreasonable, no relief is available to Flores under § 2254(d)(1) on the merits of his *Brady* claim.

---

[2] In addition, it is highly questionable whether the trial court would have had the jurisdiction and/or authority to invalidate Flores' prior MDMA conviction.  Instead, Texas law suggests that it is only the Texas Court of Criminal Appeals that could have invalidated Flores' prior MDMA conviction based on the type of drug quantity/actual innocence arguments advanced by Flores.  *See e.g., Ex Parte Cress*, No. WR-83-687-01, 2015 WL 5076908 (Tex. Crim. App. Aug. 26, 2015) (granting state habeas relief to applicant who contended "that his plea was involuntary because he was charged with the second degree felony of possession of methamphetamine in an amount of four grams or more but less than 200 grams" when "after Applicant's conviction had become final, the laboratory report was issued showing that the substance possessed by Applicant actually weighed only 3.90 grams.").

### B.   Impeachment Evidence Claim

In his second claim, Flores maintains that his due process right to present a full defense was compromised by the trial court's exclusion of evidence that could have been used to impeach Officer Scoggins.  According to Flores, Officer Scoggins had been previously suspended for conspiring to coverup a fellow officer's improper discharge of a firearm and then lying about it, but the trial court disallowed the defense from mentioning or inquiring about that suspension and any misconduct by Officer Scoggins related thereto.  Flores argues that while the Texas Court of Appeals ruled on the state evidentiary claim he raised on direct appeal, it did not reach his federal due process claim and therefore this Court is not constrained from reviewing the claim *de novo*.  In the alternative, Flores argues that any implied determination by the Texas Court of Appeals on this federal due process claim is based on an unreasonable application of *Holmes v. South Carolina*, 547 U.S. 319 (2006) and *Davis v. Alaska*, 415 U.S. 308 (1974), and an unreasonable determination that the complained of error was harmless.

A review of the Texas Court of Appeals' written rejection of this claim shows that the claim was considered and construed as both a state law evidentiary claim and a constitutional due process claim.  *Flores*, 2013 WL 709-100 at *18 ("In support of his argument that the exclusion of this testimony denied him his "constitutional right to present a defense . . . "); *19 ("At the time of trial, Scoggins was no longer under suspension, and there was no indication that he was on probation for his suspension.  And any such specific impeachment testimony is barred by rules 404(b) and 608(b).").  While the Texas Court of Appeals did not cite to or discuss any Supreme Court precedent when rejecting this claim, it did cite to, discuss, and rely on *Cloud v. State*, 567 S.W.2d 801 (Tex. Crim. App. 1978) and *McMillon v. State*, 294 S.W.3d 198, 208 (Tex. App.–Texarkana 2009), two

Texas cases which discussed and relied upon applicable Supreme Court authority. That reference to *Cloud* and *McMillon*, which in turn relied on *Alford v. United States*, 282 U.S. 687 (1931) and *Davis v. Alaska*, 415 U.S. 308 (1974), constitutes an adjudication, on the merits within the meaning of § 2254(d),of Flores' federal due process claim relative to the excluded impeachment evidence for Officer Scoggins.

With respect to the reasonableness of that adjudication under § 2254(d)(1), Flores argues that the value of the excluded impeachment evidence was high and that its exclusion prevented him from providing a factual basis for his challenge to Officer Scoggins' credibility. According to Flores, that excluded evidence of "Scoggins' prior suspension established a motive for him to testify falsely to protect the police officers during the investigation; that they tried to cover up their conduct before investigators arrived to protect themselves from prosecution or discipline; and that, if they would lie about that fact and try to cover up their conduct, they were not credible about other important issues, including the critical, contested issue of whether they announced their presence before they entered petitioner's apartment." Petitioner's Response (Document No. 21) at 9. Flores' argument makes much of the excluded impeachment evidence, but fails to tie that excluded impeachment evidence to any critical, defensive issue in the case.

At the time Flores sought to question Officer Scoggins about his five day suspension, the State objected, and the following discourse took place on the record:

Q:      Did you ever lie about what happened during a police shooting to protect another officer?

Prosecutor:  Objection, argumentative and relevance.

Court:  Sustained.

Q:      Isn't it true that you previously were suspended for five days for telling an

22

officer to –

Prosecutor:  Objection, Your Honor.

Q:      – – clean and reload – –

Prosecutor:  May we approach?

Q:      – his weapon after –

Court:  There's an objection, sir.  And that's the kind of statement you need to approach on.  The jury will disregard that.

Have the jury step out real quick.

In fact, let's go ahead and take our lunch break now.

(Jury out).

Court:  Take your seats.  Where in the heck did that come from?

Defense Counsel:  This officer has previously been suspended for – for five days for instructing a fellow officer to clean and reload his weapon.  And he lied about an officer-involved shooting.  And I should be specific – –

Court:  I'm not going to – –

Defense Counsel:  – – instructing another officer to clean and reload his weapon before internal affairs officers arrived at the scene of an officer shooting.

Court:  Okay.  I am – – unless you have some – – some evidence that this happened her in this case or some – – some evidence that he's lying about it in this case, something like that, then I'm not going to permit that.

Defense Counsel:  Well, he has denied that he would ever do that.  And so, I'm now entitled to correct that false impression – –

Court:  Well – –

Defense Counsel:  – – that he just left with the jury.

Court:  Well, that's – – that's what you laid.  And it's not like the State opened up the door and said would you ever do that.  That's a – – you can't open a

23

> door to your own, you know, stuff to come in.  You can't open up that door.
>
> Defense Counsel:  They painted a position that this [is] a lawful incident and that the police did not engage in any misconduct in the aftermath of it to protect themselves.  And there is an issue as to whether Officer Rodriguez reloaded his weapon, as to whether Officer Scoggins reloaded his weapon before internal affairs and homicide investigators arrived.  And the witness testified that he would never do that and he would never tell another officer to do that.  And I'm entitled to correct that false impression.   And it's relevant as to his credibility as to how he acted on this particular occasion.
>
> Court:  That was in response to your questions.  That was in response to your questions.  The State didn't open [up] that door to that.
>
> Defense Counsel:  Well, and my position is the door doesn't have to be opened to it.  It's relevant straight up.
>
> Court:  Well, I disagree with you.

Document No. 5-14 at 108-11.   Flores' counsel then proceeded to make a record of the testimony he would have elicited from Officer Scoggins about the suspension, and the State additionally questioned Scoggins outside the presence of the jury about the incident and whether he had ever told an officer to clean and reload his weapon prior to an internal affairs investigation.  Document No. 5-14 at 111-120.  Scoggins steadfastly maintained that he had not done so:

> It was an off-duty incident in which my partner at the time was accused of firing a weapon.  Okay.  I wasn't there.  He was intoxicated.  He called me at 4:00 o'clock in the morning and asked me to drive him home.  I didn't live too far from there.  I picked him up and drove him home.
>
> The next day there was an internal affairs investigation about him discharging his weapon at an off-duty party.  And there was a swirl of accusations.  An officer said that I told him to reload his weapon.  He didn't tell me that.  He said it to internal affairs.

Document No. 5-14 at 116.

In *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), the United States Supreme Court explained that because "the Constitution guarantees criminal defendants a meaningful opportunity

to present a complete defense,"evidence rules that "'infring[e] upon a weighty interest of the accused' and are ' "arbitrary" or disproportionate to the purposes they are designed to serve'" may violate a defendant's right to due process. (quoting *United States v. Scheffer*, 523 U.S. 303, 308, (1998). Similarly, in *Davis v. Alaska*, 415 U.S. 308, the United States Supreme Court recognized that limits on cross-examination may run afoul of the Confrontation Clause. Key to both due process inquiries, however, is whether the excluded evidence or limited cross-examination harmed the defendant. An evidentiary error is harmless if it does not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also United States v. Skelton*, 514 F.3d 433, 440 (5th Cir. 2008) (in determining whether exclusion of evidence is harmless the following factors are considered: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case").

Upon this record, which shows that the impeachment evidence Flores sought to admit was not relevant to any defensive issue in the case and was, in fact, far afield of any issue in serious contention, the Texas Court of Appeals' rejection of this due process claim on harmless error grounds was not unreasonable. *See e.g., Barnes v. Stephens*, Civil Action No. H-15-0815, 2016 WL 592841 *10-11 (S.D. Tex. Feb. 11, 2016) (rejecting due process claim based on exclusion of proposed character evidence that was determined by the state trial court to be "not sufficiently probative); *Almendarez v. Stephens*, Civil Action No. 4:14-CV-244-O, 2016 WL 215474 *6-9 (N.D. Tex. Jan. 19, 2016) (finding that state court did not unreasonably apply *Holmes v. South Carolina*

to petitioner's due process claim, which was predicated on the exclusion of bad acts and character evidence of complainant where there was sufficient admissible evidence from which the defendant could challenge the complainant's credibility); *see also Nevada v. Jackson*, ___ U.S. ___, 133 S.Ct. 1990 (2013) (rejecting due process claim under *Holmes* where Ninth Circuit, on § 2254(d)(1) review, framed Supreme Court precedents "at such a high level of generality" and collapsed "the distinction between 'an *unreasonable* application of federal law' and what a lower court believes to be 'an *incorrect* or *erroneous* application of federal law.'").   Therefore, under § 2254(d), no relief is available on this claim.

### C.   Punishment Range Admonishment Claim

In his third and final claim, Flores maintains that his federal due process rights, as articulated by the United States Supreme Court in *Boykin v. Alabama*, 395 U.S. 238 (1969), were violated when the trial court failed to admonish him about the range of punishment he faced on the hydrocodone offense.  As for the Texas Court of Appeals' rejection of that claim, Flores argues that it was based on an unreasonable application of *Boykin*, and an unreasonable and unsupportable factual determination that he was admonished during the first trial on the punishment range for the hydrocodone offense and was, therefore, well aware of the punishment range he faced.

In rejecting Flores' challenge to the hydrocodone conviction, the Texas Court of Appeals, discussed and relied upon, as follows, the state law admonishment requirements in article 26.13(a) of the Texas Code of Criminal Procedure, as well as the procedural record recitals from Flores' first trial regarding the trial court's compliance with article 26.13 of the Texas Code of Criminal Procedure:

> In his first issue, appellant argues that his conviction of the offense of possession with intent to deliver a mixture containing dihydrocodeinone "is invalid" because the

trial court failed to admonish him on the consequences of pleading guilty.

Prior to accepting a plea of guilty, a trial court must admonish the defendant on the range of punishment attached to the offense; the consequences of an agreed punishment recommendation; the possible deportation or exclusion from admission to the United States if the defendant is not a citizen; and the registration requirements of Chapter 62 of the Texas Code of Criminal Procedure, if the offense so requires. Tex.Code Crim. Proc. Ann. art. 26.13(a) (Vernon Supp.2012). In admonishing the defendant, "substantial compliance by the court is sufficient, unless the defendant affirmatively shows that he was not aware of the consequences of his plea and that he was misled or harmed by the admonishment of the court." *Id.* art. 26.13(c).

The State concedes that the trial court did not admonish appellant pursuant to article 26.13 when he pleaded guilty at his second trial for possession with intent to deliver a mixture containing dihydrocodeinone. "When there is insufficient admonition, whether by total failure to admonish or an admonition that is not in substantial compliance, the violation of Article 26.13 comes within the standard of Rule of Appellate Procedure 44.2(b)." *Anderson v. State,* 182 S.W.3d 914, 918 (Tex.Crim.App.2006). Thus, any "error, defect, irregularity, or variance" in the admonition "that does not affect substantial rights must be disregarded." *Id.* (citing Tex.R.App. P. 44.2(b)).

In applying rule 44.2(b) to the failure of the trial court to admonish a defendant, an appellate court considers the record as a whole to determine whether, in the particular case, the error affected the defendant's substantial rights. *Bessey v. State,* 239 S.W.3d 809, 813 (Tex.Crim.App.2007). The court should consider: (1) the strength of the evidence of guilt; (2) whether the record indicates that the defendant was aware of the requirement; and (3) whether the omitted admonition actually applied to the defendant's situation. *Id.* (citing *Anderson,* 182 S.W.3d at 919–21).

At trial, the State presented substantial evidence of appellant's guilt. Officer Rodriguez testified that a confidential informant had told him that appellant sold narcotics from his apartment. And Rodriguez witnessed the informant make a "buy" at the apartment and "sporadic traffic" in and out of appellant's apartment. Upon execution of the search warrant, HPD officers recovered over 1.1 kilograms of hydrocodone from appellant's apartment. Also, HPD chemist Miller testified that the individually packaged pills found in the apartment contained dihydrocodeinone, which he described as the "full chemical name" for "generic hydrocodone." Rodriguez opined that the amount of hydrocodone and its packaging were consistent with an intent to deliver it. And, most importantly, appellant admitted at trial to having possessed hydrocodone with the intent to deliver.

We note that because appellant's guilty plea did not include an agreed punishment recommendation, he is a United States citizen, and he was not convicted of an

offense requiring registration pursuant to Chapter 62, the only provision of article 26.13 with which the trial court failed to comply was the requirement to admonish appellant on the range of punishment for the offense. *See* Tex.Code Crim. Proc. Ann. art. 26.13(a).

The record contains evidence that appellant was actually aware of the applicable range of punishment for the offense. In the first trial, the trial court instructed that,

> [T]he Court, as required by law, has admonished him of the consequences. It plainly appearing to the Court that the Defendant is mentally competent, and that he makes this plea freely and voluntarily, said plea is received by the Court.

Appellant did not object to the instruction. Thus, the record indicates that appellant was informed of the applicable punishment range when he pleaded guilty at the first trial. He was also present during the punishment phase of the first trial, in which the jury was informed in open court of the applicable punishment range. And we note that appellant does not argue that his plea was involuntary due to a lack of knowledge regarding the sentencing range for the offense.

Because the State presented substantial evidence of appellant's guilt and there is evidence in the record demonstrating that he was aware of the range of punishment for the offense to which he pleaded guilty, appellant has not demonstrated that he was actually unaware of the consequences of his plea or that he was harmed. We cannot conclude that appellant was harmed by the trial court's failure to admonish him on the applicable punishment range at the second trial. *See Aguirre–Mata v. State*, 125 S.W.3d 473, 476–77 (Tex.Crim.App.2003) (holding omission of applicable punishment range in admonitions harmless where the record contained "references to the correct punishment range" and there was nothing in the record that showed that defendant "was unaware of the consequences of his plea or that he was misled or harmed"); *see also Anderson*, 182 S.W.3d at 920 (stating that because probation officer had testified at punishment phase of trial to sex-offender registration requirement, there was some evidence from which to infer defendant had knowledge of requirement). Accordingly, we hold that the trial court's error in not admonishing appellant prior to his plea of guilty in his second trial about the applicable range of punishment was harmless.

*Flores v. State*, No. 01-10-00533-CR, 2013 WL 709106, at *5–6 (Tex. App. – Houston [1ˢᵗ Dist.]

Feb. 26, 2013).  While the Texas Court of Appeals did not cite to or rely on *Boykin* in rejecting

Flores' claim, *Boykin* did not apply to the merits of Flores' claim.

In *Boykin*, the United States Supreme Court held that it is plain error for a trial court to accept a defendant's guilty plea without ensuring that the plea was intelligent and voluntary. *Boykin* does not require, and has never been extended to require, that the trial court inform the defendant of the possible punishment range. Instead, for purposes of constitutional due process, all that is required is that the defendant know, from some source, the potential penalties he faces when pleading guilty. *See Burton v. Terrell*, 576 F.3d 268, 271–72 (5th Cir. 2009) ("a trial court's failure to discharge this duty by informing the defendant of the maximum possible sentence does not invariably lead to constitutional error. This court has consistently held that the critical question is not whether the court informed the defendant of the maximum sentence, but whether the defendant knew, in fact, the maximum he faced. While we acknowledge that this is a "somewhat stingy implementation of ... *Boykin*," this court's precedent is clear that the source of the defendant's actual knowledge is of no moment to the plea's constitutionality.").

As argued by Respondent, the rule announced in *Boykin* does not fit the facts of this case. While both sides agree, and the Texas Court of Appeals found, that the trial court did not admonish Flores about the punishment range on the hydrocodone offense prior to accepting his guilty plea at the beginning of the second trial, Flores does not contend that he was unaware of the punishment range on the hydrocodone offense, and does not argue, *at all*, that his plea of guilty to the hydrocodone offense at the second trial was not intelligent and voluntary. Because *Boykin* does not *require*, for constitutional due process purposes, a record showing that the trial court admonished a defendant about the punishment range prior to accepting his guilty plea, the Texas Court of Appeals' rejection of this claim is neither contrary to *Boykin* nor an unreasonable application of *Boykin*. Moreover, to the extent Flores argues that *Boykin* should be extended and construed to

cover guilty plea situations such as his, the Supreme Court has concluded that a state court's failure to extend Supreme Court precedent cannot provide the basis for relief under § 2254(d)(1). *See White*, 134 Sct. at 1706 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'") (internal citations omitted).

As for Flores' reliance on § 2254(d)(2) and what he argues is the unsupported factual determination that he was admonished about the punishment range on the hydrocodone offense in the first trial, a review of the record supports the Court of Appeals' determination that Flores knew what the punishment range was at the time he pled guilty to the hydrocodone offense at the second trial. The record shows that Flores pled guilty to the hydrocodone offense at the first trial and that he elected to have the jury assess punishment. As such, the jury was instructed during the first trial about the punishment range on the hydrocodone offense. *See* Jury Charge on Punishment in Cause No. 1173815 (Document No. 9-1 at 38) ("You are instructed that you must now assess the punishment of the defendant at confinement in the institutional division of the Texas Department of Criminal Justice for not less than fifteen years nor more than ninety-nine years or life. In addition thereto, you may assess a fine in any amount not to exceed $10,000.00."). Because Flores was present with counsel during that punishment phase of the trial, including the reading of the jury charge on punishment, *see* Docket Sheet notes in Cause No. 1173815 (Document No. 8-20 ast 41), Flores knew, at the time he pled guilty during the second trial, what the punishment range was on the hydrocodone offense.

Upon this record, which shows that Flores knew the punishment range on the hydrocodone offense at the time he entered his guilty plea to the hydrocodone offense at the second trial, the Texas Court of Appeals' rejection of this due process claim is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Under § 2254(d), no relief is available to Flores on the merits of this claim.

## VII.   **Conclusion and Recommendation**

Based on the foregoing and the conclusion that no relief is available to Flores on the merits of any of his claims under § 2254(d), the Magistrate Judge

RECOMMENDS that Respondent's Motion for Summary Judgment (Document No. 13) be GRANTED and that Petitioner Joseph John Flores, II's Federal Application for Writ of Habeas Corpus (Document No. 1) be DENIED and DISMISSED WITH PREJUDICE.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140, 144-145 (1985); *Ware v. King*, 694 F.2d 89, 91 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk.

31

Signed at Houston, Texas, this ___ day of December, 2016.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE